# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **DONALD L. OWENS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv00068 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand to the Commissioner for an award of benefits.

## I. Background and Standard of Review

Plaintiff, Donald L. Owens, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:06-cv-00068-PMS   Document 14   Filed 03/23/07   Page 1 of 30   Pageid#: 63

transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Owens protectively filed his applications for DIB and SSI on or about March 3, 2004, alleging disability as of February 26, 2002, based on pain in the back due to bulging discs, right hand pain, weakness, swelling and numbness, severe abdominal pain, hearing loss and headaches. (Record, ("R."), at 14, 53-56, 63, 72, 315-19.) Owens's claims were denied both initially and on reconsideration. (R. at 29-31, 36, 37-39.) Owens then requested a hearing before an administrative law judge, ("ALJ"). (R. at 40.) The ALJ held a hearing on September 23, 2005, at which Owens was represented by counsel. (R. at 322-53.)

By decision dated March 8, 2006, the ALJ denied Owens's claims. (R. at 14-26.) The ALJ found that Owens met the nondisability requirements of the Act for DIB purposes through the date of the decision. (R. at 24.) The ALJ found that Owens

had not engaged in substantial gainful activity since February 26, 2002. (R. at 24.) The ALJ found that the medical evidence established that Owens had severe impairments, namely degenerative disc disease of the lumbar spine, pancreatitis, depression, anxiety and borderline IQ, but he found that Owens did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ further found that Owens's allegations regarding his limitations were not totally credible. (R. at 25.) The ALJ found that Owens had the residual functional capacity to perform light work[2] reduced by an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl and an inability to work around hazards. (R. at 25.) The ALJ found that Owens further was limited to simple, unskilled work in a low-stress environment due to emotional and intellectual limitations. (R. at 25.) The ALJ found that Owens was unable to perform any of his past relevant work. (R. at 25.) Based on Owens's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Owens could perform jobs existing in significant numbers in the national economy, including those of a product packager and a produce sorter, both at the light level of exertion, and as a machine operator/tender and a product grader/sorter/selector at the sedentary[3] level of exertion. (R. at 25.) Therefore, the ALJ found that Owens was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. §§

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2006).

-3-

404.1520(g), 416.920(g) (2006).

After the ALJ issued his opinion, Owens pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 5-7.) Owens then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on the Commissioner's motion for summary judgment filed December 13, 2006.[4]

## *II. Facts*

Owens was born in 1966, (R. at 53), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education with vocational training in welding. (R. at 69.) Owens has past work experience as a mechanic in the coal mines and as a logger. (R. at 64, 327-28.)

Owens testified at his hearing that he struggled in school and was retained in the third and eighth grades.[5] (R. at 326.) He testified that he had worked as a mechanic in the coal mines and as a logger. (R. at 327-28.) He stated that he stopped working in February 2002 after injuring his back on the job. (R. at 328-29.) Owens testified that he had some bulging and leaking discs that caused back pain and

---

[4]Owens did not file a motion for summary judgment.

[5]Owens later testified that he had to repeat the third grade because he was unable to attend school for approximately one year after his father accidentally ran over him with his truck. (R. at 337-39.) He also testified that he had to repeat the eighth grade when his parents got divorced and he "skipped" a lot of school. (R. at 339.)

-4-

headaches. (R. at 329.) He stated that he experienced these headaches once or twice a month and that they kept him down for a day or two each time. (R. at 334.) Owens further testified that he had been diagnosed with pancreatitis, which caused pain, nausea, weakness, fatigue, insomnia and tenderness of the feet. (R. at 330-31.) He stated that he suffered pancreatitis attacks approximately two to three times monthly, but that the pain was constant. (R. at 331.) Owens testified that these attacks kept him down two to three days at a time. (R. at 331.) He stated that a mass had been found on his pancreas approximately eight to 10 months previously. (R. at 342-43.) Owens testified that his back pain, which was triggered by certain activities, prevented him from standing for long periods of time and was aggravated by bending and stooping. (R. at 332, 335.) Owens stated that he had to change positions frequently. (R. at 332.) He testified that surgery had not been recommended for his back and that he was taking Percocet as needed. (R. at 333, 344.)

At the time of the hearing, Owens testified that he was undergoing counseling. (R. at 335.) Owens testified that he could sometimes read a newspaper and that he could count change. (R. at 337.) He stated that he mostly sat at home and watched television, but that he also walked around his yard or "down in the hollow" sometimes. (R. at 339.) Owens stated that he attended church twice weekly. (R. at 340.) He testified that he had a driver's license, but that he had to take the test three times before passing. (R. at 340.) He stated that he sometimes drove. (R. at 341.)

Leah Salyers, a vocational expert, also was present and testified at Owens's hearing. (R. at 349-52.) Salyers classified Owens's past work as an underground coal

Case 1:06-cv-00068-PMS   Document 14   Filed 03/23/07   Page 5 of 30   Pageid#: 67

miner performing mechanic activities as between heavy[6] and very heavy[7] and skilled. (R. at 350.) Salyers testified that because this job was more "hands-on," an individual in the borderline range of intellectual functioning would not be precluded from performing it. (R. at 351.) Salyers next testified that an individual of Owens's age who could perform light work could perform the jobs of a product packager and a produce sorter. (R. at 351.) Salyers testified that the same individual could perform the jobs of a machine operator and tender and a product grader/sorter/selector, both at the sedentary level of exertion. (R. at 351.) Finally, Salyers testified that an individual who suffered two to three pancreatic attacks a month, each lasting two to three days, would not be able to perform any jobs. (R. at 352.)

On May 3, 2002, Owens was seen at Stone Mountain Health Services. (R. at 260.) Physical examination revealed mild epigastric tenderness. (R. at 260.) He was diagnosed with gastroesophageal reflux disease, ("GERD"), and was prescribed Zantac. (R. at 261.) On May 20, 2002, a physical examination again revealed tenderness in the left upper quadrant. (R. at 258.) Owens denied depression at that time. (R. at 258.) He was diagnosed with left upper quadrant pain and chronic back pain and was prescribed Prilosec. (R. at 259.)

---

[6]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2006).

[7]Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can perform very heavy work, he also can perform heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2006).

-6-

Owens saw Dr. Sharat K. Narayanan, M.D., on June 16, 2003, with complaints of stomach pain. (R. at 257.) He was diagnosed with a hiatal hernia and low back pain. (R. at 257.) Dr. Narayanan again prescribed Zantac. (R. at 257.) On September 10, 2003, Owens complained of chronic epigastric pain and swelling on the left side of the scrotum. (R. at 255.) He was diagnosed with epigastric pain, scrotal swelling on the left and low back pain. (R. at 256.) He was referred for surgical consultation regarding his epigastric pain and scrotal swelling and was advised to continue his medications. (R. at 254, 256.)

On July 15, 2002, Owens presented to the emergency department at Welch Community Hospital with complaints of mid abdominal pain for the previous four days. (R. at 141.) He stated that he could not eat due to pain. (R. at 141.) A chest x-ray and an abdominal x-ray both were normal. (R. at 145.) Owens was diagnosed with helicobacter pylori gastritis and was prescribed Tetracycline, Flagyl and Zantac. (R. at 139-40.) He again presented to the emergency department on July 22, 2002, for a follow-up of his stomach problems. (R. at 137.) Owens noted that he was taking Helidac, which seemed to be helping. (R. at 137.) Dr. David Eells, M.D., opined that Owens had reflux, and he scheduled a barium swallow upper gastrointestinal series, which was performed on July 25, 2002, and revealed a hiatal hernia with massive cardioesophageal reflux. (R. at 137-38.) On July 29, 2002, Owens noted that he was doing better with Zantac. (R. at 135.) In addition to Zantac, Dr. Eells prescribed Reglan and Amoxil. (R. at 135.) On October 3, 2002, Owens continued to complain of problems related to his hiatal hernia. (R. at 133.) He reported that he had taken one of his mother's medications which helped him. (R. at 133.) Owens was instructed to call his mother to find out what this medication was. (R. at 133.) Dr. Eells noted that

-7-

Owens left to make the phone call, but never returned.  (R. at 133.)

On October 2, 2003, Owens saw Dr. Jeffrey A. Larsen, M.D., at Dr. Narayanan's referral.  (R. at 184-85.)  Owens reported abdominal pain, headaches, hearing loss and ringing in the ears, bad breath or bad taste in the mouth, chest pain and angina, sexual difficulties, joint stiffness and swelling, back pain and nervousness.  (R. at 184.)  A physical examination revealed vague epigastric thickening on palpation and mild epigastric tenderness.  (R. at 185.)  No specific masses were noted.  (R. at 185.)  Dr. Larsen ordered a CT scan of the abdomen and pelvis, which was performed on October 8, 2003.  (R. at 185, 195-96.)  Increased vascularity and slight inhomogenous density of the pancreas was noted, suspicious for a mass.  (R. at 196.)  A dirty appearing mesentery in the mid abdomen with soft tissue densities suggestive of lymphadenopathy also was noted.  (R. at 196.)  No evidence of metastatic disease to the liver was noted.  (R. at 196.)  On October 13, 2003, Owens continued to complain of epigastric pain on an almost daily basis.  (R. at 182.)  Dr. Larsen noted no specific masses to palpation of the abdomen.  (R. at 182.)  However, he noted a small umbilical hernia.  (R. at 182.)  Owens was referred to Dr. John Ehrenfried, M.D., for further evaluation.  (R. at 182.)  He was advised to remain off of work.  (R. at 182.)

On October 21, 2003, Owens saw Dr. John Ehrenfried, M.D., at Surgical Associates of Kingsport, Inc., for complaints of abdominal pain.  (R. at 165.)  Dr. Ehrenfried noted normal active bowel sounds and no tenderness, distention, guarding, rebound, masses, hepatosplenomegaly, bruits or thrills.  (R. at 164.)  A small umbilical hernia was noted.  (R. at 164.)  No inguinal lymphadenopathy or extremity edema was

noted, and Owens's peripheral pulses were equal. (R. at 164.) Based on the prior CT scans, Dr. Ehrenfried wished to proceed with a workup to determine whether Owens had pancreatitis versus a tumor. (R. at 164.) He referred Owens to Dr. Jerry London, M.D., for an upper endoscopy, endoscopic ultrasound and biopsy. (R. at 164.)

On October 27, 2003, Owens underwent an endoscopic ultrasound, which revealed duodenal/pancreatic varices and chronic pancreatitis. (R. at 146.) On November 4, 2003, Dr. Ehrenfried noted that the ultrasound showed changes consistent with probable portal hypertension with no obvious mass in the head of the pancreas. (R. at 163.) He further noted that due to the vascular nature of the area, no biopsies were performed. (R. at 163.) A trans jugular hepatic wedge pressure and biopsy was arranged. (R. at 163.) On November 6, 2003, Owens underwent a needle biopsy of the liver. (R. at 151-55.) He was diagnosed with minimal hepatic steatosis[8] and mild hepatic glycogenosis.[9] (R. at 153.)

On December 9, 2003, Owens reported doing "some better." (R. at 181.) Dr. Ehrenfried and Dr. London, did not feel that Owens had pancreatic carcinoma, but a loss of a lot of vascularity around the head of the pancreas. (R. at 181.) Owens was diagnosed with testicular cord swelling on the left side, an umbilical hernia and a hiatal hernia. (R. at 181.) He was given samples of Protonix and Percocet. (R. at 181.) Dr. Larsen noted that, given the remarkable nature of Owens's disease, he

_____

[8]Hepatic steatosis is fatty degeneration of the liver. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), at 752, 1579 (27th ed. 1988).

[9]Hepatic glycogenosis is glycogen storage disease of the liver. *See* Dorland's at 707, 752.

-9-

would be permanently disabled, and he noted that he had informed Owens that he would "assist him to this end." (R. at 181.) An ultrasound of the scrotum, performed on December 11, 2003, showed a likely varicocele[10] and a small left hydrocele.[11] (R. at 189.) A CT scan of the abdomen, performed on January 8, 2004, showed enlargement of the pancreatic head, possibly representing malignancy, probable cysts in both kidneys and numerous nodules in the mesenteric and omental fat suggestive of adenopathy. (R. at 171-72.)

On January 13, 2004, Owens reported good results with Percocet, as needed. (R. at 160.) On January 23, 2004, Owens underwent testing of the liver and spleen, which revealed splenules in the left upper abdominal quadrant and increased tracer activity in the pancreatic head compatible with hypervascular lesion. (R. at 169-70.) On February 20, 2004, Owens's abdomen had normal active bowel sounds, was soft, nontender and nondistended and was without guarding, rebound, masses, hepatosplenomegaly, bruits or thrills. (R. at 158.) Dr. Larsen opined that Owens needed to follow up with a hepatologist. (R. at 157.) On February 24, 2005, Owens complained of continued epigastric pain "on and off" and worsening acid reflux. (R. at 252.) Owens reported that Prilosec was not helping him. (R. at 252.) Dr. Narayanan reported that a note from the University of Virginia, dated February 7, 2005, indicated that Owens did not have a pancreatic mass, but it was suspected that he had abnormal vasculature that was congenital. (R. at 252.) He was diagnosed with

---

[10]A variocele is a varicose condition of the veins of the pampiniform plexus, forming a swelling that feels like a "bag of worms," appearing bluish through the skin of the scrotum, and accompanied by a constant pulling, dragging or dull pain in the scrotum. *See* Dorland's at 1807.

[11]A hydrocele is a circumscribed collection of fluid, especially a collection of fluid in the tunica vaginalis of the testicle or along the spermatic cord. *See* Dorland's at 782.

-10-

GERD and chronic epigastric pain. (R. at 253.) Dr. Narayanan prescribed Protonix. (R. at 253.)

On March 17, 2004, Owens reported experiencing abdominal pain after riding his motorcycle. (R. at 180.) Dr. Larsen noted that Owens's situation was "fairly benign" at that time. (R. at 180.) A physical examination revealed very mild epigastric discomfort with normal active bowel sounds. (R. at 180.) The upper abdomen had a slightly doughy consistency. (R. at 180.) Dr. Larsen suggested treatment of pain symptomatically. (R. at 180.) Owens was prescribed Percocet. (R. at 180.) On March 26, 2004, Owens was seen at Buchanan County Rural Family Practice with complaints of upper abdominal pain. (R. at 216.) He was diagnosed with abdominal pain and portal vein thrombosus. (R. at 216.) An ultrasound of the liver and doppler studies were ordered. (R. at 216.) On April 23, 2004, Owens again was diagnosed with abdominal pain and was prescribed Tylenol 3. (R. at 214.) On May 24, 2004, a physical examination revealed abdominal tenderness. (R. at 213.) Owens was again diagnosed with abdominal pain and was prescribed Percocet. (R. at 213.) On June 7, 2004, Owens was diagnosed with splenules and pancreatic disease in addition to abdominal pain. (R. at 212.) On July 7, 2004, Owens's diagnoses remained unchanged. (R. at 211.) He was advised to continue all physical modalities and use good body mechanics. (R. at 211.) Owens also was advised to use heat and ice as needed. (R. at 211.)

On August 4, 2004, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment, finding that Owens could perform medium work. (R. at 197-204.) Dr. Surrusco found that Owens could

occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 200.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 200-02.) These findings were affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on September 28, 2004. (R. at 204.)

Owens's diagnoses remained unchanged on August 16, 2004, September 13, 2004, and October 13, 2004. (R. at 207-08, 210.) On October 20, 2004, Dr. Hartman completed a Residual Physical Functional Capacity Assessment, finding that Owens could perform light work diminished by an ability to stand and/or walk at least two hours in an eight-hour workday. (R. at 221-28.) He found that Owens could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 224.) Dr. Hartman imposed no manipulative, visual or communicative limitations. (R. at 224-26.) He found that Owens should avoid all exposure to work hazards, such as heights and machinery. (R. at 226.) Dr. Hartman noted that although Owens had some functional limitations, the degree of limitation was not commensurate with a total inability to work. (R. at 228.)

On January 14, 2005, Owens saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the request of his attorney. (R. at 229-38.) Owens was fully oriented and exhibited no signs of delusional thinking or evidence of ongoing psychotic processes. (R. at 232.) Lanthorn noted that Owens's affect was generally flat and blunt, and it was evident that he was somewhat tense and anxious. (R. at 232.) Owens had difficulty focusing his concentration, but he steadfastly persisted at tasks. (R. at 232.) He reported that he had never received psychological treatment, but he reported feeling depressed and down. (R. at 233.) He

-12-

acknowledged some transitory suicidal ideation. (R. at 233.) Owens reported nervousness at times, particularly in crowds, and crying "quite a bit." (R. at 233.)

Lanthorn administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), on which Owens achieved a verbal IQ score of 66, a performance IQ score of 72 and a full-scale IQ score of 65, placing him in the extremely low range of intellectual functioning. (R. at 233.) Lanthorn deemed these results valid. (R. at 232.) The Pain Patient Profile, ("P/3"), also was administered, and Owens scored in the most extreme level on the depression, anxiety and somatization scales. (R. at 234-35.) The Personality Assessment Inventory, ("PAI"), also was administered. (R. at 235.) Lanthorn noted that Owens's profile was consistent with a significant depressive experience. (R. at 235.) The profile also indicated a clear degree of marked somatic concerns, a discomforting level of anxiety and tension, social isolation and a negative and harsh self-evaluation. (R. at 236.) Lanthorn noted that Owens's test results indicated that his thought processes were likely to be marked by distractibility, difficulty with concentration and confusion. (R. at 236.) Lanthorn diagnosed major depressive disorder, single episode, severe, generalized anxiety disorder, pain disorder associated with both psychological features and a general medical condition, chronic, mild mental retardation and a then-current Global Assessment of Functioning, ("GAF"), score of 40 to 45.[12] (R. at 236-37.) Lanthorn

_____

[12]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32. A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

-13-

opined that Owens's prognosis was guarded, if not poor. (R. at 237.) He strongly recommended that Owens seek the services of his local mental health center for both psychotherapy and a psychiatric evaluation to ascertain the need for psychotropic medications for depression, anxiety and secondary insomnia. (R. at 237.) Lanthorn opined that Owens had significant psychological difficulties that contributed to cognitive problems, such as poor concentration, memory loss, difficulty initiating and persisting at tasks, enervation and a rather markedly diminished degree of self-esteem. (R. at 237-38.)

Lanthorn also completed a Mental Assessment Of Ability To Do Work-Related Activities, concluding that Owens was markedly limited in his abilities to understand, remember and carry out short, simple instructions, to interact appropriately with supervisors and to respond appropriately to changes in a routine work setting. (R. at 240-41.) In all other areas evaluated, Lanthorn opined that Owens was extremely limited. (R. at 240-41.)

On January 25, 2005, Owens was seen at University of Virginia by Dr. Mansour Parsi, M.D., for evaluation of his pancreatic mass. (R. at 244-45.) Owens reported continued epigastric pain with radiation to the back on a daily basis, worsened with activity and after eating. (R. at 244.) However, Owens reported that, at that time, he was pain-free. (R. at 244.) A physical examination revealed normal bowel sounds, no tenderness, masses or organomegaly. (R. at 244.) He exhibited a normal mood and affect. (R. at 245.) An MRI of the pancreas was ordered, as was an endoscopic ultrasound, which, on February 7, 2005, revealed congenital abnormal vasculature. (R. at 242, 245.)

-14-

On March 31, 2005, Dr. Narayanan referred Owens to University of Virginia for chronic pain management. (R. at 249-50.) Owens was diagnosed with GERD and chronic abdominal pain possibly secondary to chronic pancreatitis. (R. at 251.) On May 2, 2005, Owens continued to complain of chronic epigastric pain. (R. at 247.) Owens was diagnosed with chronic epigastric pain. (R. at 247.) The following day, Owens was referred to the University of Virginia Pain Management Department. (R. at 246.)

On July 5, 2005, Owens again saw Dr. Narayanan for a follow up. (R. at 298-99.) Owens reported that Percocet helped him "quite well." (R. at 298.) He reported no significant radiation of pain in the epigastric region left upper quadrant except occasional radiation towards the back. (R. at 298.) He reported no associated nausea or vomiting. (R. at 298.) Owens stated that the pain was usually triggered by physical activity such as bending forward, but not by eating. (R. at 298.) He was diagnosed with chronic epigastric and left upper quadrant pain. (R. at 299.)

On July 13, 2005, Owens was seen at Mountain Comprehensive Care Center for a psychological assessment. (R. at 275–77.) It was noted that Owens had an appropriate affect and a depressed mood, but was fully oriented. (R. at 277.) His attention and concentration were described as listless. (R. at 277.) Owens's intelligence was deemed to be average. (R. at 277.) On August 9, 2005, it was again noted that Owens was depressed and his concentration was impaired, but his affect was deemed appropriate. (R. at 278.) On September 6, 2005, Owens reported decreased sleep, becoming easily aggravated, increased worry about his health and increased isolation. (R. at 279.)

-15-

Owens saw Arthur C. Ballas, Ph.D., a licensed psychologist, for a psychological evaluation on November 9, 2005. (R. at 300-07.) Ballas administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), which revealed that Owens had a seventh-grade reading ability and a fourth-grade arithmetic ability. (R. at 302.) The Wechsler Abbreviated Scale of Intelligence, ("WASI"), also was administered, which yielded a verbal IQ score of 70, a performance IQ score of 74 and a full-scale IQ score of 69, placing Owens in the upper portion of the mild mentally retarded classification of DSM-IV. (R. at 302.) On the Wechsler Memory Scale-Form I, ("WMS-I"), Owens again scored in the mentally retarded range. (R. at 302.) On the P/3 Owens produced elevations on all three scales. (R. at 302.) Owens produced a valid PAI protocol, indicating significant depression and anxiety symptomatology. (R. at 302.)

Ballas concluded that Owens was experiencing significant depression and co-morbid anxiety symptoms secondary to rather marked health concerns and physical malfunctioning. (R. at 303.) He opined that Owens's emotional condition was likely to deteriorate over time. (R. at 303.) Ballas also completed a Mental Assessment Of Ability To Do Work-Related Activities, finding that Owens was slightly limited in his abilities to understand, remember and carry out simple job instructions. (R. at 308-09.) He was deemed moderately limited in his abilities to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting. (R. at 308-09.) Ballas opined that Owens was markedly limited in his ability to respond appropriately to work pressures in a usual work setting. (R. at 309.)

-16-

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 8, 2006, the ALJ denied Owens's claims. (R. at 14-26.) The ALJ found that the medical evidence established that Owens had severe

-17-

impairments, namely degenerative disc disease of the lumbar spine, pancreatitis, depression, anxiety and borderline IQ, but he found that Owens did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Owens had the residual functional capacity to perform light work reduced by an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl and an inability to work around hazards. (R. at 25.) The ALJ found that Owens further was limited to simple, unskilled work in a low-stress environment due to emotional and intellectual limitations. (R. at 25.) The ALJ found that Owens was unable to perform any of his past relevant work. (R. at 25.) Based on Owens's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Owens could perform jobs existing in significant numbers in the national economy. (R. at 25.) Therefore, the ALJ found that Owens was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

In his brief, Owens argues that the ALJ erred by finding that his conditions did not meet the listing for affective disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04, the listing for anxiety-related disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06, and the listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 10-12.) Owens also argues that the ALJ erred by failing to find that he was disabled due to painful pancreatic attacks two to three times monthly that would cause him to miss two to three days of work monthly. (Plaintiff's Brief at 12.)

-18-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the evidence, I find that substantial evidence does not exist in this record to support the ALJ's findings that Owens did not meet the listing for affective disorders, found at § 12.04. In order to meet § 12.04, a claimant must show that he suffers from at least four of the listed symptoms of depressive syndrome, which result in at least two of the following:

-19-

1.   Marked restriction of activities of daily living;
2.   Marked difficulties in maintaining social functioning;
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1), 12.04(B) (2006).   The symptoms of depressive syndrome, found at § 12.04(A)(1), include the following: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt or worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; and (9) hallucinations, delusions or paranoid thinking.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(1) (2006). A claimant also may meet the requirements of § 12.04 if he has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities.  *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04(C) (2006).

I first note that substantial evidence does not support the ALJ's decision to accord little weight to Lanthorn's assessment.  The ALJ reasoned that Lanthorn relied "quite heavily" on Owens's subjective allegations and self-imposed limitations in reaching his conclusions regarding the severity of his limitations.  I disagree.  In addition to the mental status examination, Lanthorn administered three diagnostic tests, the results of which were deemed valid.  Lanthorn noted no evidence of malingering or symptom magnification.  By way of mental status examination, Owens did not report very severe symptoms.  He noted that he was "depressed and down," that he was easily aggravated, that he preferred to be alone, that he had poor energy,

-20-

that he experienced anhedonia and that he had experienced some transitory suicidal ideation. (R. at 233.) Owens further reported anxiety, particularly in crowds, and crying quite a bit when alone. (R. at 233.) Lanthorn observed that Owens's affect was generally flat and blunt and that he was somewhat tense and anxious. (R. at 232.) Lanthorn further noted that Owens had difficulty focusing his concentration, noting that he was able to perform only one step of Serial 7's, becoming "completely confused and being unable to go any further on the task." (R. at 232.) Owens also was unable to spell the word "world" backwards, and he could recall only two of five words after 10 minutes. (R. at 232.) He gave a concrete but correct interpretation to only one of three commonly used adages, and was unable to interpret the remaining two at all. (R. at 232.)

As noted above, the objective mental testing, which was deemed valid, revealed that Owens had a verbal IQ score of 66, a performance IQ score of 72 and a full-scale IQ score of 65. (R. at 233.) On the P/3, Owens scored in the most extreme level on all three scales. (R. at 234-35.) Finally, the PAI profile was consistent with a significant depressive experience, a discomforting level of anxiety and tension, likely social isolation with few interpersonal relationships, distractibility, difficulty with concentration and confusion and experiencing discomfort in social situations. (R. at 235-36.) Given all of these test findings, Lanthorn proceeded to find that Owens was markedly or extremely limited in all abilities to do work-related mental activities. (R. at 240–41.)

Lanthorn's assessment is further supported by the findings of psychologist Ballas, who, in November 2005, administered more objective mental testing. (R. at

300-07.)  The ALJ accepted the findings of Ballas, specifically noting the finding that Owens was markedly limited in his ability to respond appropriately to work pressures in a usual work setting.  (R. at 22.)  Ballas noted that Owens was compliant and cooperative throughout the evaluation and was perceived as genuine in his responses and test efforts.  (R. at 301.)  Ballas deemed the test results valid.  (R. at 301.)  The WRAT-3 revealed a seventh-grade reading level and a fourth-grade arithmetic level. (R. at 302.)  Due to the possibility of potential practice effects, Ballas utilized the WASI, a different IQ instrument than that administered by Lanthorn.  (R. at 302.)  The results of this testing revealed a verbal IQ score of 70, a performance IQ score of 74 and a full-scale IQ score of 69.  (R. at 302.)  Ballas noted that these scores correlated reasonably well with the prior testing and supported an interpretation of intellectual functioning in the upper portion of the mild mentally retarded range.  (R. at 302.) Moreover, Ballas noted that the WMS-I revealed a memory quotient in the mentally retarded range, and he further noted that Owens's overall performance was consistent with his WASI efforts, lending further support to the validity of his IQ scores.  (R. at 302.)  The P/3 revealed  elevations on all three scales.  (R. at 302.)  The PAI profile indicated significant depression and anxiety symptomatology.  (R. at 302.)  Based on these findings, Ballas further concluded that Owens was markedly limited in his ability to respond appropriately to work pressures in a usual work setting and moderately limited in his ability to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting.  (R. at 308-09.)

-22-

Because it appears that the ALJ was mistaken that Lanthorn's assessment was based on merely subjective allegations and because the record contains no objective testing to contradict Lanthorn's assessment, I find that Owens's condition met or equaled § 12.04(B). That being the case, I must now assess whether Owens's condition met or equaled § 12.04(A). For the following reasons, I find that it does. I first note that Owens reported sleep disturbance, a "so-so appetite," a poor energy level and anhedonia to Lanthorn. (R. at 233.) Lanthorn also noted that Owens's hands were mildly tremulous at times and that it was difficult for Owens to concentrate. (R. at 232-33.) Lanthorn further noted that Owens's psychomotor speed and manual dexterity were in the borderline range, as was his rote and immediate memory. (R. at 234-35.) The depression scale of the P/3 indicated anhedonia and disturbance of sleep and appetite, among other things. (R. at 234.) The somatization scale of the P/3 indicated that suffering and pain were occupying a disproportionate amount of Owens's attention and concentration, causing him to be easily distracted. (R. at 235.) The PAI further indicated an individual plagued with thoughts of worthlessness and hopelessness and an individual likely to show a disturbance in sleep pattern, decrease in energy level and possible change in appetite and/or weight. (R. at 235.) The PAI also indicated likely psychomotor slowing and an individual plagued by worry to a degree that the ability to concentrate and attend was significantly compromised. (R. at 235-36.)

Thus, I find that, based on valid objective psychological testing, there is evidence in the record that Owens suffers from anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness and difficulty concentrating, thereby meeting the criteria of §

-23-

12.04(A).

For the above-stated reasons, I find that the ALJ substituted his own judgment for that of mental health professionals by finding that Owens's impairments did not meet or equal the criteria of § 12.04. Thus, I further find that substantial evidence does not support the ALJ's finding that Owens's condition did not meet or equal the criteria for affective disorders, found at § 12.04.

Next, Owens argues that the ALJ erred by failing to find that his impairments met or equaled the listing for anxiety-related disorders, found at § 12.06. I disagree. In order to meet the criteria of § 12.06, a claimant must show by medically documented findings that he suffers from at least one of the following:

1.  Generalized persistent anxiety accompanied by three of the following: motor tension, autonomic hyperactivity, apprehensive expectation or vigilance and scanning;
2.  A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation;
3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week;
4.  Recurrent obsessions or compulsions which are a source of marked distress; or
5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A) (2006). A claimant also must show that his condition results in at least two of the following: marked restriction of

activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(B) (2006). If a claimant cannot show that his condition resulted in two of the previous problems, he still may qualify for benefits under this section if he can show that his symptoms have resulted in a complete inability to function independently outside the area of his home. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C) (2006).

There simply is no evidence contained in the record that Owens's condition met or equaled any of the criteria contained in § 12.06(A). Thus, the only way that Owens can show that his condition met or equaled the criteria of § 12.06 is to show that his symptoms have resulted in a complete inability to function independently outside the area of his home. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C). There simply is no evidence of this contained in the record. Thus, for all of these reasons, I find that substantial evidence supports the ALJ's finding that Owens's condition did not meet or equal the criteria for anxiety-related disorders, found at § 12.06.

Next, Owens argues that the ALJ erred by failing to find that his condition met or equaled the criteria for the listing for mental retardation, found at § 12.05(C). In order to qualify as disabled under § 12.05(C), a claimant's condition must meet two requirements: (1) a valid IQ score of 60 through 70 and (2) a physical condition or other mental impairment imposing additional and significant work-related limitation of function. The regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings,

among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *Townsend*, 581 F. Supp. at 159. Additionally, the mental deficits must have manifested during the claimant's developmental stage, i.e., prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D). *See Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

The uncontradicted medical evidence contained in this record documents that Owens meets the first prong of § 12.05(C) for mental retardation. Valid intelligence testing performed by psychologist Lanthorn revealed that Owens had a full-scale IQ score of 65, and valid intelligence testing by psychologist Ballas revealed a full-scale IQ score of 69. (R. at 233, 302.) The Fourth Circuit has held that a claimant's IQ remains relatively constant over his lifetime, absent any evidence of change in intellectual functioning. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)); *see also Sird v. Chater*, 105 F.3d 401, 403, n.4 (8th Cir. 1997); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986); *Hampton v. Apfel*, 59 Soc. Sec. Rep. Serv. 711, 1999 WL 46614 (E.D. Pa. Jan. 6, 1999); *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1379-80 (N.D. Ga. 1998); *McElroy v. Apfel*, 55 Soc. Sec. Rep. Serv. 751, 1998 WL 196457 (N.D. Ill. Apr. 17, 1998); *Prentice v. Apfel*, 55 Soc. Sec. Rep. Serv. 850, 1998 WL 166849 (N.D. N.Y. Apr. 8, 1998) *Gant v. Sullivan*, 773 F. Supp. 376, 381

-26-

(S.D. Fla. 1991). While the Commissioner argues that these IQ scores do not accurately reflect Owens's intellectual abilities, either during the developmental period or at the current time, I disagree. Among other things, the Commissioner relies upon Owens's lengthy work history as a mechanic in the coal mines, a skilled job, to refute the low IQ scores. However, the Fourth Circuit held in *Luckey* that an ALJ may not rely upon previous work history to prove nondisability where the § 12.05(C) criteria are met. *See* 890 F.2d at 669. In any event, I note that the vocational expert testified that an individual with a borderline IQ would not be precluded from performing this type of work due to its "hands on" nature. (R. at 351.) In addition to Owens's work history, the Commissioner relies upon the following: Owens graduated from high school in the top two-thirds of his class in regular classes, he completed a vocational program in welding, he completed the paperwork connected with his disability claim without assistance and he obtained a driver's license by passing a written examination. However, I note that Owens graduated from high school, not with a regular diploma, but with a vocational diploma and that it took Owens three attempts to pass the written examination to obtain his driver's license. I find that the accomplishments enumerated by the Commissioner are not inconsistent with an individual functioning in the mentally retarded range. Thus, I will proceed to assess whether Owens meets the second prong of § 12.05(C), namely, whether he has a physical condition or other mental impairment imposing additional and significant work-related limitation of function. For the following reasons, I find that he does.

As discussed above, Lanthorn concluded that Owens was either markedly or extremely limited in all mental abilities to perform work-related activities. (R. at 240-41.) Similarly, Ballas concluded that Owens was either moderately or markedly

limited in all abilities to perform work-related mental activities with the exception of understanding, remembering and carrying out simple instructions, which Ballas deemed were only slightly limited. (R. at 308-09.) I find that such limitations cannot be deemed "meaningless." Moreover, I note that the ALJ found that Owens's degenerative disc disease of the lumbar spine, pancreatitis, depression, anxiety and borderline IQ all constituted severe impairments. That being the case, I find that Owens's condition met or equaled the second prong of § 12.05(C) and, therefore, substantial evidence does not exist for the ALJ's finding that his impairment did not meet or equal that listing. In fact, I find that the uncontradicted evidence shows that Owens's condition met this listing.

Finally, Owens argues that the ALJ erred by failing to find that he was disabled based on his pancreatitis. Specifically, Owens argues that he suffers from such severe pain that he would miss work two to three days per month and that, based upon the vocational expert's testimony, he would not be able to perform any jobs. I disagree with Owens's argument. I find that the ALJ considered Owens's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595.

-28-

This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers....

76 F.3d at 595. Here, the ALJ concluded that, while Owens's degenerative disc disease and pancreatitis could be expected to produce some pain, the record failed to show objective evidence of an impairment reasonably expected to produce the debilitating pain alleged by Owens. (R. at 21.) I find that substantial evidence supports this finding. Lengthy testing revealed no pancreatic mass, but a congenital abnormal vasculature. (R. at 242, 252.) While Dr. Larsen, in December 2003, opined that Owens was disabled due to this condition, findings of disability are reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2006). I note that only three months later, Dr. Larsen stated that Owens's condition was "fairly benign" at that time. (R. at 180.) The ALJ accepted the opinion of state agency physician Dr. Hartman that Owens could perform light work with occasional climbing, balancing, stooping, kneeling, crouching and crawling and an inability to work around machinery or heights. (R. at 22, 221-28.) This finding is supported by the evidence of record. First, I note that it is supported by Owens's self-reported activities of daily living, as outlined above. I further note that, with the exception of Dr. Larsen, no other treating source placed any restrictions on Owens's activities. In January 2005, Owens reported that he was "pain-free" at that time, and the following month, he reported

-29-

epigastric pain "on and off." (R. at 244, 252.) Finally, the record reveals that Owens was taking Percocet, which he reported helped to control his pain. (R. at 160, 198.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Owens's pancreatic pain was not disabling.

*III. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the Commissioner for an award of benefits.

An appropriate order will be entered.

DATED:      This 23rd day of March 2007.


/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-30-